No. 12-14356-DD

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

JAMES E. MOSS & AVADA L. JENKINS,

Defendants-Appellants
_____

ON APPEAL FROM THE JUDGMENT
OF THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
(No. 11-cr-26)
_____

CONSOLIDATED BRIEF FOR THE APPELLEE
_____

KATHRYN KENEALLY
 *Assistant Attorney General*

FRANK P. CIHLAR                    (202) 514-5396
 *Chief, Criminal Appeals &*
 *Tax Enforcement Policy Section*
GREGORY VICTOR DAVIS   (202) 514-5396
ALEXANDER P. ROBBINS   (202) 514-5396
 *Attorneys*
 *Tax Division*
 *Department of Justice*
 *Post Office Box 502*
 *Washington, D.C. 20044*

*Of Counsel*:
SANDRA J. STEWART
 *Acting United States Attorney*

*United States v. James Moss and Avada Jenkins*,
No. 12-14356-DD

CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT

As required by Fed. R. App. P. 26.1, 11th Cir. R. 26.1-1, and 11th Cir. R. 26.1-2(b), I certify that, in addition to the persons and entities identified in the certificate of interested persons and corporate disclosure statement in the appellant's brief, the following persons and entities may have an interest in the outcome of this case:

1.  Cihlar, Frank Phillip, Chief, Criminal Appeals and Tax Enforcement Policy Section, Tax Division, Department of Justice.

2.  Davis, Gregory Victor, Attorney for the United States, Tax Division, Department of Justice.

3.  Internal Revenue Service, victim.

4.  Keneally, Kathryn, Assistant Attorney General, Tax Division, Department of Justice.

5.  Stewart, Sandra J., Acting United States Attorney

6.  Robbins, Alexander P., Attorney for the United States, Tax Division, Department of Justice.

 s/ Alexander P. Robbins
ALEXANDER P. ROBBINS
*Attorney for the United States*

DATED:    April 29, 2013

C-1 of 1

- i -

## STATEMENT REGARDING ORAL ARGUMENT

Counsel for the United States do not believe that oral argument would help the Court dispose of this case.

## TABLE OF CONTENTS

Page

Table of Citations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii
Table of Record References in the Brief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii
Statement of Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Statement of the Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.   Course of Proceedings and Disposition Below . . . . . . . . . . . . . . . . . . 3
    B.   Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    C.   Standards of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Summary of the Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    I.     The Evidence Was Sufficient . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    II.    Defendants' Guidelines Ranges Were Correctly Calculated . . . . . . 17

        A.   Moss Obstructed Justice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        B.   The District Court Correctly Found That Moss and
             Jenkins Caused a Tax Loss of at Least $7 Million . . . . . . . . 20

            1.   The district court's tax-loss finding did not rely
                on statistical sampling . . . . . . . . . . . . . . . . . . . . . . . . 21

            2.   Defendant's statistical arguments are misguided . . . . . 24

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
Certificate of Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

- ii -

# TABLE OF CITATIONS

Cases:                                                                                          Page

Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) ................................ 14
Cheek v. United States, 498 U.S. 192, 111 S.Ct. 604 (1991) ............................... 14
Hammerschmidt v. United States, 265 U.S. 182, 44 S. Ct. 511 (1924) ............... 14
Jackson v. Virginia, 443 U.S. 307, 99 S. Ct. 2781 (1979) ................................... 13
Pinkerton v. United States, 328 U.S. 640, 66 S. Ct. 1180 (1946) ....................... 14
United States v. Alvarez, 755 F.2d 830 (11th Cir. 1985) .............................. 14, 15
* United States v. Amedeo, 370 F.3d 1305 (11th Cir. 2004) ............................... 18
United States v. Barrington, 648 F.3d 1178 (11th Cir. 2009) ....................... 10, 17
United States v. Browne, 505 F.3d 1229 (11th Cir. 2007) ................................... 13
United States v. Chaplin's, Inc., 646 F.3d 846 (11th Cir. 2011) ......................... 21
United States v. Chavez, 584 F.3d 1354 (11th Cir. 2009) ................................... 13
United States v. Coveney, 995 F.2d 578 (5th Cir. 1993) ..................................... 14
United States v. Garcia, 13 F.3d 1464 (11th Cir. 1994) ...................................... 18
* United States v. Gometz, 730 F.2d 475 (7th Cir. 1984) ................................... 27
United States v. Hasson, 333 F.3d 1264 (11th Cir. 2003) ................................... 14
United States v. Jordan, 374 Fed. App'x 3 (11th Cir. 2010) .............................. 23
United States v. McGarity, 669 F.3d 1218 (11th Cir. 2012) ............................... 24
* United States v. Mehta, 594 F.3d 277 (4th Cir. 2010) ..................................... 24
United States v. Mieres-Borges, 919 F.2d 652 (11th Cir. 1990) ......................... 13
United States v. Nevils, 598 F.3d 1158 (9th Cir. 2010) ...................................... 13
United States v. Porter, 591 F.2d 1048 (5th Cir. 1979) ...................................... 14
United States v. Silvestri, 409 F.3d 1311 (11th Cir. 2005) ................................. 14
United States v. Stone, 702 F.2d 1333 (11th Cir. 1983) ..................................... 13
United States v. Taylor, 88 F.3d 938 (11th Cir. 1996) ....................................... 19
* United States v. Tinoco, 304 F.3d 1088 (11th Cir. 2002) .................... 10, 13, 16
United States v. Westry, 524 F.3d 1198 (11th Cir. 2008) ................................... 16


Statutes:

18 U.S.C. § 3231 .................................................................................................. 1
18 U.S.C. § 371 ............................................................................................. 3, 14
18 U.S.C. § 3742 .................................................................................................. 2
26 U.S.C. § 7206 ........................................................................................... 3, 14
28 U.S.C. § 1291 .................................................................................................. 2


Miscellaneous:

Fed. R. App. P. 26.1 ............................................................................................ 1
Fed. R. App. P. 31 ............................................................................................. 31
Fed. R. App. P. 32 ............................................................................................. 30
Fed. R. App. P. 4 ................................................................................................. 2

- iii -

## TABLE OF RECORD REFERENCES IN THE BRIEF

| Brief Page(s) | Description | Docket # |
|---|---|---|
| 1-3, 6, 17-28 | Sentencing Transcript (cited as "Sentencing Tr.") | 319 |
| 1, | Jenkins Judgment | 280 |
| 1, 3 | Moss Judgment | 282 |
| 2 | Notices of Appeal | 284, 286 |
| 3 | Indictment | 1 |
| 3, 18 | Trial Transcript Volume 7 (cited as "Tr. 7.") | 314 |
| 4-8, 10, 15, 19 | Trial Transcript Volume 1 (cited as "Tr. 1.") | 308 |
| 4-10, 15, 16, 19, 23, 24 | Trial Transcript Volume 4 (cited as "Tr. 4.") | 311 |
| 4-7, 9 ,12, 15, 16, 26 | Trial Transcript Volume 5 (cited as "Tr. 5.") | 312 |
| 4 | Government's Exhibit 173 (Admitted at Tr. 5.93-94) | N/A |
| 5-8, 20, 22, 23, 26 | Trial Transcript Volume 2 (cited as "Tr. 2.") | 309 |
| 5, 6, 17. 20-23, 27, 28 | Trial Transcript Volume 6 (cited as "Tr. 6.") | 313 |
| 7, 8, 16 | Trial Transcript Volume 3 (cited as "Tr. 3.") | 310 |
| 8 | Government's Motion to Dismiss Count 3 of the Indictment as to Moss | 201 |
| 14 | Jury Instructions | 151 |

- iv -

| 17, 22 | Moss Presentence Investigation Report | N/A |
|--------|---------------------------------------|-----|
| 17, 22 | Jenkins Presentence Investigation Report | N/A |
| 18 | Government's Motion for a Downward Variance as to Jenkins | 261 |
| 22 | Government's Sentencing Memorandum for Moss | 263 |
| 22 | Government's Sentencing Memorandum for Jenkins | 262 |

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-14356-DD

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

JAMES E. MOSS & AVADA L. JENKINS,

Defendants-Appellants

_____

ON APPEAL FROM THE JUDGMENT
OF THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
(No. 11-cr-26)

_____

CONSOLIDATED BRIEF FOR THE APPELLEE

_____

STATEMENT OF JURISDICTION

Defendants James Moss and Avada Jenkins appeal from judgments imposed

on them by the United States District Court for the Middle District of Alabama (the

Hon. Mark E. Fuller, presiding), which had jurisdiction over their criminal

prosecution under 18 U.S.C. § 3231.  The district court announced its sentences on

July 26, 2012, and imposed its final judgments on August 9, 2012.  (Sentencing

- 2 -

Tr. 71-72, 123; Docs. 280 (Jenkins judgment), 282 (Moss judgment).)[*]  Defendants

filed timely notices of appeal on August 20, 2012 (Docs. 284, 286), *see* Fed. R.

App. P. 4(b), and this Court has jurisdiction over their appeals under 28 U.S.C.

§ 1291 and 18 U.S.C. § 3742.

## STATEMENT OF THE ISSUES

1.  Numerous witnesses testified that defendants Moss and Jenkins

participated in a conspiracy to defraud the United States by using Moss's return-

preparer business, "Flash Tax," to file fraudulent tax returns.  Was the evidence

against defendants constitutionally insufficient?

2.  Numerous witnesses testified that Moss, after learning about the IRS's

criminal investigation, told them to falsely shift the blame for Flash Tax's fraud to

a former Flash Tax employee.  Did the district court clearly err in imposing a two-

level sentencing enhancement on Moss for obstruction of justice?

3.  In calculating the total tax loss caused by defendants' conspiracy, the

district court found that at least 50% of the returns prepared by Flash Tax during

the conspiracy period claimed fraudulent refunds.  In light of the evidence at trial

that almost all of the refunds Flash Tax obtained for its clients were fraudulent,

was the district court's finding clearly erroneous?

---

[*] Throughout this brief, "Doc." refers to the docket number of a document in the district court's record, "Sentencing Tr." refers to the Sentencing Transcript (Doc. 319), "Tr." refers to one of the seven volumes of the trial transcript (Docs. 308-14), and "Supp. RE" refers to the government's supplemental expanded record excerpts.  Also, "Moss Br." and "Jenkins Br." refer to the defendants' respective briefs, and "Moss PSR" and "Jenkins PSR" refer to the Probation Officer's Presentence Investigation Reports.

- 3 -

# STATEMENT OF THE CASE

*A.    Course of Proceedings and Disposition Below*

On February 17, 2011, a grand jury indicted (Doc. 1) defendants James

Moss and Avada Jenkins, along with three others, charging them with conspiring

to defraud the United States (in violation of 18 U.S.C. § 371) and with 26 counts of

aiding and assisting in the preparation and presentation of false tax returns (in

violation of 26 U.S.C. § 7206(2)).

The other three defendants — Lutoyua Thompson, Chiquita Broadnax, and

Melinda Lambert — pleaded guilty.  Moss and Jenkins went to trial.  After a

seven-day jury trial, Moss was convicted of conspiracy to defraud and 24 of the 26

false-return counts.  The remaining two counts were dismissed on the

government's motion.  (Doc. 282 (Moss judgment); Tr. 7.70-71.)  Jenkins was

convicted of conspiracy to defraud and 20 of the 26 false-return counts; she was

acquitted of five of them, and the remaining false-return count was dismissed on

the government's motion.  (Doc. 280 (Jenkins judgment); Tr. 7.69-70.)

Moss was sentenced to 160 months' imprisonment (within his Guidelines

range of 151 to 188 months), and Jenkins was sentenced to 41 months' imprison-

ment (below her Guidelines range, which was 78 to 97 months before the

government's motion for a downward variance).  (*See* Sentencing Tr. 64, 71-72,

98, 123.)  Moss and Jenkins appeal their convictions and sentences.

*B.    Statement of Facts*

James Moss owned and operated Flash Tax, a tax-return preparation

business with offices in Montgomery, Alabama — as well as in Birmingham and

- 4 -

Tuscaloosa — that operated from 2003 through 2007.[1]  Jenkins was one of Flash Tax's return preparers; she started at Flash Tax in late 2004 and worked at the main office in Montgomery.[2]

Moss "was known for getting the maximum amount back for his clients."[3] He did so by manipulating the income reported on his clients' tax returns to ensure that they received the maximum possible "Earned Income Credit," as well as a refund of any taxes they had already paid to the IRS.  The Earned Income Credit ("EIC" or "EITC") is a tax credit for people "in the lower income brackets" — as a person begins to make income, the EIC increases at first and then decreases at higher income levels.[4]  Although the EIC schedule varies by filing status and number of dependents (and changes somewhat from year to year), the EIC amounts for the tax years at issue in this case reached a plateau for annual incomes between roughly $10,000 and $15,000.[5]  Reporting an adjusted gross income in this range would allow a filer to obtain the maximum possible EIC amount: approximately

---

[1] *See* Tr. 1.52 (Lambert testimony); Tr. 4.197 (Broadnax testimony); Tr. 5.191-93 (Wilson testimony).

[2] Tr. 1.71 (Lambert testimony); Tr. 5.17 (Thompson testimony).

[3] Tr. 4.134 (Stewart testimony).

[4] Tr. 5.91-92 (McMillian testimony); *see also* IRS Pub. 596, Earned Income Credit, *available at* www.irs.gov/pub/irs-pdf/p596.pdf.

[5] *See* Gov't Exh. 173 (attached as an addendum to this brief).

- 5 -

$2,500 if the person reported having one dependent or $4,500 if the person

reported two dependents.[6]

Moss taught his return preparers to find this "sweet spot," as he called it.[7]

As one return preparer put it: if a client came in who "made too much money, they

need to make less money," and if a client "made not enough money," then "[y]ou

would give them more money."[8]  None of Moss's return preparers had any

background in preparing tax returns,[9] and Moss's training consisted of teaching

them to manipulate the numbers they plugged into a computer program in order to

obtain the largest possible refund on a given tax return.[10]  This training did not

involve any actual tax law: there were no "tax books," "tax manuals," or "IRS

publications."[11]  One former Flash Tax preparer described how she would simply

experiment with the computer program to see "how fast I could do a tax return";

another testified that he and others would learn to use the program by playing a

---

[6] *Id.*; *see also* Tr. 4.113 (Hargrove testimony) ("[W]e g[a]ve them between 12 and $15,000 to get the max refund."); Tr. 1.77 (Lambert testimony) ("You're mainly going for a $4,000 range of a refund.").

[7] Tr. 4.181 (Crittenden testimony).

[8] Tr. 2.146 (Babies testimony).

[9] *See* Tr. 1.54-55 (Lambert testimony); Tr. 4.136 (Stewart testimony); Tr. 4.193 (Broadnax testimony); Tr. 5.9 (Thompson testimony); *see also* Tr. 4.143 (Stewart testimony) (noting that Moss "didn't like to hire people with college degrees").

[10] *See* Tr. 5.27 (Thompson testimony); Tr. 5.130 (McMillian testimony).

[11] Tr. 1.59 (Lambert testimony); *see also* Tr. 4.100-01 (Hargrove testimony); Tr. 4.137-38 (Stewart testimony); Tr. 4.196 (Broadnax testimony); Tr. 5.10 (Thompson testimony).  *But see* Tr. 6.127-31 (testimony by Eddie Warren, a former co-owner of Flash Tax, contradicting the testimony of these other witnesses).

- 6 -

"game" in which the goal was to see "what's the highest [refund] number we can get on a tax return" for someone without any reported salary or withholding.[12] These training sessions generally took place at Moss's house, and they had an informal, "party atmosphere," complete with "wing trays" and "Margaritas or cocktails or whatever liquor [Moss] had at his home."[13]  As one return preparer recalled:  "Mainly it would be about, you know, just us having a good time, sitting over at James' house.  After it we were excited about getting started to try to make money."[14]

Between 2005 and 2007, Flash Tax prepared over 8,000 tax returns and obtained approximately $30 million in refunds for its clients.[15]  (There is no evidence that Flash Tax ever prepared a return in which the client owed money to the IRS.[16])  During this time period Flash Tax had gross receipts of over $4 million,[17] charging its clients more than $500 per return, a fee that

---

[12] Tr. 4.121 (Hargrove testimony); Tr. 2.168 (Babies testimony).

[13] Tr. 1.59 (Lambert testimony); Tr. 5.18 (Thompson testimony).

[14] Tr. 1.170 (Lambert testimony).

[15] Sentencing Tr. 24, 28.

[16] *See* Tr. 4.142 (Stewart testimony); Tr. 5.15 (Thompson testimony); *cf.* Tr. 6.91, 6.98 (Dean testimony) (one Flash Tax client did not receive a refund, but only because the IRS intercepted it).

[17] Tr. 5.175 (Wilson testimony); *see also* Tr. 5.197 (noting that this figure includes receipts from multiple Flash Tax offices).

"automatically came out of the refund" the client received from the IRS.[18]  The

return preparers received $50 for each return they prepared and filed, plus a bonus

for reaching certain numerical targets.[19]  Flash Tax's computer system

automatically recorded the preparer of each return, which dictated who would get

paid for preparing that return.[20]

Twenty-two former Flash Tax clients testified at trial.  Those who had jobs

that paid them wages testified that Flash Tax's return preparers added fake

business expenses to their tax returns in order to lower their income to the EIC

"sweet spot" range and to obtain refunds of any taxes that had been withheld from

their wages.[21]  Those without steady employment were falsely listed by Flash Tax

as "self-employed"[22] and given fake business income in order increase their income

into the range that would yield the maximum EIC amount.[23]  One such client was

---

[18] Tr. 4.184 (Crittenden testimony); Tr. 2.62 (Lambert testimony).  *See also* Tr. 4.106 (Hargrove testimony) (stating the Flash Tax charged up to $700 or $800 per return); Tr. 2.61 (Lambert testimony) (giving a range of $600 to $900).

[19] *See, e.g.*, Tr. 1.54 (Lambert testimony); 2.148 (Babies testimony).

[20] *See* Tr. 4.206 (Broadnax testimony); Tr. 5.21 (Thompson testimony).

[21] *See* Tr. 4.73 (Boyd testimony, corresponding to count 4 of the indictment); Tr. 2.210-12 (Tidwell, count 5); Tr. 3.61-62 (Hubbard, count 10); Tr. 3.151-52 (Reeves, counts 13 and 14); Tr. 3.94-95 (Satcher, count 18); Tr. 4.58-60 (Tierce, counts 21 and 22).

[22] Tr. 1.74 (Lambert testimony); *see also* Tr. 4.155 (Stewart testimony) (explaining that Flash Tax targeted "self-employed people . . . who actually didn't work").

[23] *See* Tr. 3.103-04 (Acreman testimony, corresponding to count 2 of the indictment); Tr. 3.194-95 (Edwards, count 6); Tr. 3.203-05 (Givhan, count 7); Tr. 4.16-17 (Hardy, count 8); Tr. 3.252 (Myrick, née Harvey, count 9); Tr. 3.244 (Kinnel, count 11); Tr. 3.184 (Lewis, count 12); Tr. 4.47 (Rivers, count 15); Tr.

(continued...)

- 8 -

actually an undercover IRS special agent, who testified that Flash Tax fraudulently

inflated his income and listed a fake dependent on his return.[24]  A number of other

clients likewise testified that Flash Tax added fake dependents to their returns in

order to increase their EIC amounts.[25]

Six former Flash Tax return preparers testified that these incidences were not

flukes or accidents: each told the jury that Moss knowingly directed them to

prepare false returns, either by "coaching" the clients to give certain numbers or by

simply making up numbers and putting them on the returns.[26]  As one return

_____

[23] (...continued)
4.25 (Rose, count 16); Tr. 266-67 (Sankey, count 17); Tr. 3.229 (Smith, count 19);
Tr. 2.192-93 (Cooley, count 20); Tr. 4.5-6 (Townser, counts 23 and 24); Tr. 3.14
(Williams, count 26).  *Cf.* Tr. 3.216 (Boggan, count 3, which was subsequently
dismissed on the government's motion, *see* Doc. 201).

[24] Tr. 2.113-19 (Olade testimony, corresponding to count 27 of the indictment); *see
also* Tr. 2.125 ("she told me I needed at least one dependent").

[25] *See* Tr. 3.103-04 (Acreman testimony, corresponding to count 2 of the
indictment); Tr. 4.16-17 (Hardy, count 8); Tr. 3.184 (Lewis, count 12); Tr. 3.229
(Smith, count 19); Tr. 4.58-60 (Tierce, counts 21 and 22); Tr. 2.113-19 (Olade,
count 27).

[26] *See* Tr. 1.78 (Lambert testimony) ("Q. Did [Moss] know that you were making
the numbers up . . . ?  A. Yes."); Tr. 2.146 (Babies testimony) (Moss trained him
that if a client came in who "made too much money, they need to make less
money," and if a client "made not enough money," then "[y]ou would give them
more money.); Tr. 2.164 (Babies testimony, on cross-examination) ("Q. To your
knowledge, when you were there, was there any conspiracy going on down at
Flash Tax amongst people to do fraudulent returns? A. Yes. . . ."); Tr. 4.105
(Hargrove testimony) ("Give them a business and ask them how much did they
make in the business.  And they'll say they made a certain amount, and then we
was supposed to say, we can get you 12 or $15,000, between 12 and 15,000 to
boost your income if you had two dependents and get the maximum refund."); Tr.
4.163 (Hargrove testimony, on cross-examination) ("Q. So are you saying James
Moss told you to lie and prepare fraudulent returns on each one of those occasions?
A. In other words, yes."); Tr. 4.166 (Stewart testimony) (Moss "told us to

(continued...)

preparer put it: "Mr. Moss was aware of everything that was going on because he started it."[27]

Moss had a plan to deal with an IRS audit of any particular client's tax return: he would buy a receipt book and "just make up" documentation for the claims on that person's return.[28]  But as the widespread fraud at Flash Tax became increasingly apparent, Moss was forced to take additional measures.  When Moss learned about the IRS's criminal investigation in 2007, he then met with three of his return preparers — Jenkins, Lambert, and Broadnax — and instructed them to give sworn statements to his lawyer falsely blaming a former return preparer,

---

[26] (...continued)
. . . persuade [clients] to say between 10 and 13,000."); Tr. 4.175 (Crittenden testimony) (explaining that Moss and Jenkins trained him to "[c]oach" Flash Tax clients "into saying that [family members] were disabled," so that those people could be listed as dependents); Tr. 4.182 (Crittenden testimony) (stating that he was also trained by Jenkins); Tr. 4.195 (Broadnax testimony) (explaining that Moss told them not to report "self-employed income" over $14,000 "[b]ecause if you go over $14,000, the return will be lower"); Tr. 5.11 (Thompson testimony) ("Q. Where were you supposed to get these numbers? A. We would pretty much coach the customers to get them in the ball[park] figure they needed to be in to get the max refund.  Q. Did Mr. Moss teach you how to coach the customers? A. Yes."); Tr. 5.39 (Thompson testimony, on cross-examination) ("Q. You went in and put some figures in yourself and kind of hid them from the customers, did you not? A. That's what we were taught to do.").

[27] Tr. 5.62-63 (Thompson testimony).

[28] Tr. 4.135 (Stewart testimony).

Lutoyua Thompson, for the fraud at Flash Tax.[29]  After they gave these statements,
Moss fired them.[30]

C.    *Standards of Review*

On appeal, Moss and Jenkins challenge both their convictions and their
sentences:

1. *Insufficient-evidence claims*.  (*See* Moss Br. 59-62; Jenkins Br. 17-20.)
When reviewing whether the evidence presented at trial was sufficient to sustain a
conviction, this Court defers to the jury's verdict but not to the district court: it
"review[s] *de novo* the legal question of whether the record contains sufficient
evidence to support the guilty verdict," viewing "the evidence in the light most
favorable to the government and resolv[ing] all reasonable inferences and
credibility evaluations in favor of the jury's verdict."  *United States v. Tinoco*, 304
F.3d 1088, 1122 (11th Cir. 2002).

2. *Sentencing claims.*  (*See* Moss Br. 36-59; Jenkins Br. 13-17.)  This Court
reviews a district court's interpretation of the Guidelines *de novo* and its findings
of fact for clear error.  *United States v. Barrington*, 648 F.3d 1178, 1194-95 (11th
Cir. 2009).  This clear-error standard of review applies to both the obstruction-of-
justice enhancement the district imposed on Moss, *see United States v. Singh*, 291
F.3d 756, 763 (11th Cir. 2002) ("We review for clear error the district court's

---

[29] Tr. 1.85 (Lambert testimony) ("Q. Was he asking you to blame somebody?  A.
Pretty much, yes, sir.  Q. Who was he asking you to blame?  A. Lutoyua."); Tr.
4.210 (Broadnax testimony) ("Q. Did you talk at all during this meeting about who
trained you to do the returns?  A. He told us to say Lutoyua trained us.  Q. Was that
true?  A. No.").

[30] Tr. 1.87 (Lambert testimony); Tr. 4.213, 4.246 (Broadnax testimony).

- 11 -

factual findings necessary for an obstruction of justice enhancement."), as well as

to the factual findings underlying the district court's tax-loss calculation for both

defendants, *see United States v. Cabrera*, 172 F.3d 1287, 1292 (11th Cir. 1999)

("We review the district court's loss determination for clear error").  For factual

findings to be clearly erroneous, this Court "must be left with a definite and firm

conviction that a mistake has been committed." *United States v. Rodriguez-Lopez*,

363 F.3d 1134, 1137 (11th Cir. 2004) (quotation mark omitted).  A legal or factual

error in applying the Guidelines requires remand for re-sentencing unless the

"district judge clearly states that he would impose the same sentence" regardless of

the Guidelines range.  *United States v. Barner*, 572 F.3d 1239, 1248 (11th Cir.

2009).

## SUMMARY OF THE ARGUMENT

1.  The jury in this case was correctly instructed, and the jury heard

testimony that Moss trained Flash Tax's employees to prepare false returns and

that Jenkins prepared false returns as Moss had taught her to.  (*See* Moss Br. 60;

Jenkins Br. 18.)  Their challenges to the sufficiency of the evidence therefore fail;

to whatever extent the evidence was conflicting, it was the jury's prerogative to

weigh that evidence and evaluate the credibility of the witnesses who testified at

trial.

2.  Witnesses testified at trial that Moss instructed them to give sworn

statements to Moss's lawyer falsely blaming someone else for the fraud at Flash

Tax.  The district court therefore correctly imposed a two-level sentencing

enhancement on Moss for obstruction of justice.

- 12 -

3.  Flash Tax obtained approximately $30 million in tax refunds for its clients for the tax years 2004, 2005, and 2006.  In calculating the total tax loss caused by defendants' conspiracy, the district court found that approximately 50% of the returns submitted by Flash Tax during the conspiracy period claimed fraudulent refunds, which put the tax loss between $7 million and $20 million, the relevant range for sentencing purposes.  In light of the evidence at trial that almost all of the returns submitted by Flash Tax claimed fraudulent refunds, the district court's finding was if anything overly conservative — and far from clearly erroneous.  As for defendant's arguments regarding statistical sampling, these arguments are beside the point: they reflect a misunderstanding of both statistics and the process by which the district court calculated the tax loss in this case, which did not rely on sampling.

## ARGUMENT

## I

### THE EVIDENCE WAS SUFFICIENT

Both defendants argue (Moss Br. 59-62; Jenkins Br. 17-20) that the district court should have granted their motions for judgments of acquittal (Tr. 5.228), although neither defendant identifies any particular counts of conviction as lacking sufficient evidence.  Instead, Moss claims (Moss Br. 62) generally that the witnesses who testified against him were "biased" and that their testimony was "rebutted" by the witnesses he called in his defense case, and Jenkins claims (Jenkins Br. 20) that "she was merely performing the job Mr. Moss had trained her

- 13 -

to perform" and therefore "was not a knowing participant in any conspiracy." These arguments fail.

The Due Process Clauses of both the Fifth and Fourteenth Amendments "protect[] a defendant in a criminal case against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *Jackson v. Virginia*, 443 U.S. 307, 315, 99 S. Ct. 2781, 2787 (1979) (internal quotation marks omitted). Accordingly, a conviction is insufficient as a matter of law if the evidence at trial was so deficient that "no reasonable jury could [have] conclud[ed] that the evidence establishe[d] guilt beyond a reasonable doubt." *United States v. Browne*, 505 F.3d 1229, 1253 (11th Cir. 2007) (applying *Jackson*); *see also United States v. Nevils*, 598 F.3d 1158, 1163 (9th Cir. 2010) (en banc) ("Our review of the constitutional sufficiency of evidence to support a criminal conviction is governed by *Jackson v. Virginia*."). This rule applies equally to both direct evidence and circumstantial evidence, *see United States v. Mieres-Borges*, 919 F.2d 652, 656-57 (11th Cir. 1990), and it is the jury's prerogative to infer criminal intent (or lack thereof) from the relevant facts and circumstances, *see United States v. Stone*, 702 F.2d 1333, 1335 (11th Cir. 1983) ("the government can use circumstantial evidence to prove willfulness"). Similarly, it is the jury's prerogative to weigh conflicting evidence and to make credibility determinations. *See United States v. Chavez*, 584 F.3d 1354, 1363 (11th Cir. 2009) (this Court views "the evidence in the light most favorable to the Government, drawing all reasonable inferences and credibility choices in the Government's favor."); *see also Tinoco*, 304 F.3d at 1122.

- 14 -

The jury in this case was correctly instructed regarding the elements of

conspiring to defraud the United States and of aiding and assisting in the

presentation of a false return.  (*See* Doc. 151 at 7-10.)[31]  The jury was also correctly

instructed that, under *Pinkerton v. United States*, 328 U.S. 640, 66 S. Ct. 1180

(1946), a conspirator is liable for the substantive crimes of a co-conspirator if those

crimes occurred as part of the conspiracy and "it was reasonably foreseeable that a

coconspirator would commit the crime as a consequence of the conspiracy."  (Doc.

151 at 12.)  *See* Eleventh Circuit Pattern Jury Instruction (Criminal Cases) No.

13.5; *see also United States v. Alvarez*, 755 F.2d 830, 847 (11th Cir. 1985)

(explaining the *Pinkerton* doctrine); *United States v. Silvestri*, 409 F.3d 1311,

1335-36 (11th Cir. 2005) (applying the *Pinkerton* doctrine to money laundering).

Like any other factual question, the "application of the *Pinkerton* doctrine to a

---

[31] As this court has explained, the "elements of a conspiracy under 18 U.S.C. § 371 are (1) an agreement among two or more persons to achieve an unlawful objective; (2) knowing and voluntary participation in the agreement; and (3) an overt act by a conspirator in furtherance of the agreement." *United States v. Hasson*, 333 F.3d 1264, 1270 (11th Cir. 2003).  In the case of a conspiracy to defraud the United States, the object of the conspiracy may be "to cheat the government out of property or money," but also extends to any intent "to interfere with or obstruct one of its lawful government functions by deceit, craft or trickery, or at least by means that are dishonest." *United States v. Porter*, 591 F.2d 1048, 1005 (5th Cir. 1979) (quoting *Hammerschmidt v. United States*, 265 U.S. 182, 188, 44 S. Ct. 511, 512 (1924)); *see Bonner v. City of Prichard*, 661 F.2d 1206, 1209-11 (11th Cir. 1981) (en banc) (adopting pre-October 1981 precedents of the Fifth Circuit).  Proof of a violation of 26 U.S.C. § 7206(2) "must establish that (1) the defendant advised or assisted in the preparation of a tax return, (2) the return was false or fraudulent as to a material matter, and (3) the defendant acted willfully in doing so." *United States v. Coveney*, 995 F.2d 578, 588 (5th Cir. 1993).  "Willfulness" in the criminal-tax context refers to a "voluntary, intentional violation of a known legal duty." *Cheek v. United States*, 498 U.S. 192, 201, 111 S.Ct. 604, 610 (1991) (also noting that questions of intent "are characteristically questions for the factfinder").

particular set of facts ultimately is for the jury to decide." *Alvarez*, 755 F.2d at 848.

On appeal, defendants challenge neither the district court's instructions to the jury nor their counts of conviction with respect to any specific tax return. Defendant's arguments are all or nothing: defendants do not, for example, challenge any particular counts of conviction as occurring before or after their involvement in the conspiracy, or argue that any particular returns were not submitted as part of the conspiracy. (*See, e.g.*, Jenkins Br. 17 (referring to "the jury's verdicts" but challenging only the conspiracy count).) Accordingly, the only question on appeal is whether the jury could reasonably infer from the evidence presented at trial that the defendants were in a conspiracy with each other — and others — to submit false tax returns to the IRS. If so, then the jury could reasonable convict defendants of both the conspiracy charge and the false-return charges, including the false-return charges in which the returns were prepared by their co-conspirators.

The answer to this question is clearly yes: a jury could reasonably infer, as this jury did, that Moss and Jenkins — along with Thompson, Broadnax, and Lambert — were all members of a conspiracy to submit false tax returns. Flash Tax's former return preparers (including Thompson, Broadnax, and Lambert) testified that Moss was the leader of this conspiracy, *see supra* n.26, and a number of these witnesses also testified that Jenkins was present for Moss's training and that she prepared false returns along with the rest of them. (*See* Tr. 1.66 (Lambert testimony); Tr. 4.182 (Crittenden testimony); Tr. 5.24 (Thompson testimony); *see*

- 16 -

*also* Tr. 5.47 (Thompson testimony) ("I sat right next to Ms. Jenkins.  We did the same thing every day.").)  Moreover, even without this direct evidence of a conspiracy, the fact that Moss and Jenkins prepared numerous false returns was itself sufficient to allow the jury to infer the existence of a conspiracy in which both were knowing members.[32]  *See United States v. Westry*, 524 F.3d 1198, 1212 (11th Cir. 2008) ("A conspiracy may be inferred from a concert of action." (internal quotation marks omitted)).

Significantly, both Moss and Jenkins concede the existence of this evidence against them.  (*See* Moss Br. 60 ("Although some of the government witnesses, primarily the co-defendants in this case, testified that Mr. Moss trained them to prepare fraudulent tax returns, their testimony was biased and contradictory."); Jenkins Br. 18 ("[T]he trial testimony demonstrates that Ms. Jenkins, like her other co-defendants[] employed by Mr. Moss[,] were taught to prepare returns in a way to maximize customer's [sic] refunds.").)  Defendants' challenges to the sufficiency of the evidence therefore fail.  To whatever extent the evidence was conflicting, it was the jury's prerogative to weigh that evidence and evaluate the credibility of the witnesses who testified at trial.  *See Tinoco*, 304 F.3d at 1122.

---

[32] The government established that Moss prepared false returns for at least five witnesses, *see* Tr. 4.75 (Boyd); Tr. 3.205 (Givhan); Tr. 3.253 (Myrick, née Harvey); Tr. 3.153 (Reeves); Tr. 3.228 (Smith), either through the witness's own recollection or through Flash Tax's records as reflected on the filed returns.  *See* Tr. 4.206 (Broadnax testimony), Tr. 5.21 (Thompson testimony) (explaining that Flash Tax's records of who prepared a given return were particularly important because they dictated who would be paid for preparing that return).  Similarly, the government established that Jenkins prepared false returns for at least seven witnesses.  *See* Tr. 3.101 (Acreman); Tr. 3.62 (Hubbard); Tr. 3.186-87 (Lewis); Tr. 3.154 (Reeves), Tr. 4.27 (Rose); Tr. 4.64 (Tierce); Tr. 3.14 (Williams).

- 17 -

## II

### DEFENDANTS' GUIDELINES RANGES WERE CORRECTLY CALCULATED

Defendants challenge their sentences as procedurally unreasonable, arguing that the district court miscalculated their respective sentencing ranges under the Sentencing Guidelines. *See United States v. Barrington*, 648 F.3d 1178, 1194-95 (11th Cir. 2009) (explaining that "procedural unreasonableness" includes a "significant procedural error, such as . . . improperly calculating[] the Guidelines range"). At sentencing, the district court calculated a base offense level of 26 for both Moss and Jenkins, finding that they caused the government to lose between $7 million and $20 million in tax revenue. (Sentencing Tr. 61-62 (citing USSG §2T4.1(K), which fixes a base offense level based on "tax loss").) Each defendant then received a 2-level sentencing enhancement under §2T1.4(b)(1)(B) for being "in the business of preparing or assisting in the preparation of tax returns," and Moss received two additional enhancements: a 4-level enhancement under §3B1.1(a) for his role as an organizer and leader of the criminal scheme, and a 2-level enhancement under §3C1.1 for obstruction of justice. (*See* Sentencing Tr. 64, 91, 98; Moss PSR ¶51, 53; Jenkins PSR ¶40).) These calculations resulted in an offense level of 34 for Moss, corresponding to a Guidelines range of 151-188 months' incarceration, and an offense level of 28 for Jenkins, corresponding to a Guidelines range of 78-97 months' incarceration. *See* USSG §5A (sentencing table). For Jenkins, however, the district court granted the government's motion for a six-level downward variance (Doc. 261; Sentencing Tr. 67), and then varied

- 18 -

downward one additional level, giving her a final offense level of 21 and a

sentencing range of 37 to 46 months' incarceration. (Sentencing Tr. 70-71.)

Both defendants were sentenced within the Guidelines ranges calculated by

the district court: Moss was sentenced to 160 months' imprisonment (*id.* at 123),

and Jenkins was sentenced to 41 months' imprisonment (*id.* at 72). (Sentencing Tr.

70-72.) Moss challenges his sentence on two grounds, arguing (1) that the district

court clearly erred when it imposed the obstruction-of-justice enhancement (Moss

Br. 56-59), and (2) that the district court incorrectly calculated the tax loss (Moss

Br. 36-50). Jenkins challenges only the district court's tax-loss calculation

(Jenkins Br. 13-17), offering an abbreviated version of Moss's argument.

Defendants' arguments fail.

A.    *Moss Obstructed Justice*

Section 3C1.1 of the Sentencing Guidelines provides, in relevant part, for a

two-level sentencing enhancement if a defendant "willfully obstructed or impeded,

or attempted to obstruct or impede, the administration of justice with respect to the

investigation, prosecution, or sentencing of the instant offense of conviction." This

includes "threatening, intimidating, or otherwise unlawfully influencing a co-

defendant, witness, or juror, directly or indirectly, or attempting to do so." USSG

§3C1.1 comment. (n.4); *accord United States v. Garcia*, 13 F.3d 1464, 1470-71

(11th Cir. 1994) (upholding an obstruction-of-justice sentencing enhancement

where a defendant "attempt[ed] to induce" a co-conspirator to "not speak with FBI

agents"); *United States v. Amedeo*, 370 F.3d 1305, 1319 (11th Cir. 2004) (holding

that a defendant's "urging [another person] to lie . . . could be deemed an unlawful

attempt to 'unlawfully influence' a witness within the meaning of §3C1.1"
(internal alteration omitted)).  This sentencing enhancement applies to "attempt[s]"
— there is no requirement that the defendant's obstruction actually succeed.  *See*
*United States v. Taylor*, 88 F.3d 938, 944 (11th Cir. 1996).

At sentencing, the government argued for an obstruction-of-justice
enhancement on three independent bases.  (Sentencing Tr. 85.)  The district court
accepted the government's third basis: that Moss, once he found out he was under
investigation, told his return preparers to falsely "pin it all on Lutoyua Thompson."
(*Id.* at 85; *see also id.* at 96.)  The court found, based on the evidence at trial, that
there "was a concerted and premeditated plan to cover up and/or point blame at
other individuals," and that Moss attempted "to basically push blame for the
totality of this conspiracy on one or other employees in [his] business."  (*Id.* at 86,
90).  As the district court noted, there was "ample evidence from the record at trial
to support" this finding.  (*Id.* at 97.)  Lambert and Broadnax both testified that
Moss instructed them to give sworn statements to Moss's lawyer falsely blaming
Lutoyua Thompson for the fraud at Flash Tax.  (*See* Tr. 1.85 (Lambert testimony);
Tr. 4.210 (Broadnax testimony).)  The fact that Moss and his lawyer subsequently
produced these statements to the IRS (Moss Br. 57) does not undermine the district
court's finding but supports it: creating false statements in order to produce them to
the IRS was the means by which Moss sought to obstruct justice.

Moss's brief misses the mark when it characterizes (Br. 57) Lambert's and
Broadnax's testimony as "full of contradictions" and asserts (Br. 59) that Moss
acted with benign motives.  Whether to credit Lambert's and Broadnax's testimony

was a question of fact for the sentencing court, presided over by the district judge

who actually heard and saw those witnesses testify at trial.  *See Singh*, 291 F.3d at

763-64.  Moss admits in his brief to this Court (Moss Br. 20) that his "co-

defendants testified" that he "asked them to lie about his involvement [in the]

fraud" at Flash Tax, and that admission is sufficient to dispose of his argument.

B.    *The District Court Correctly Found That Moss and Jenkins Caused a Tax*
      *Loss of at Least $7 Million*

Moss and Jenkins both challenge the district court's tax loss calculation,

arguing that the court erred in finding that they caused a tax loss between

$7 million and $20 million.  (Sentencing Tr. 61-62 (citing USSG §2T4.1(K)).)  *See*

*also* USSG §1B1.3(a) (basing a defendant's Guidelines range on "all reasonably

foreseeable acts and omissions of others in furtherance of the jointly undertaken

criminal activity").  This Court reviews a "district court's loss determination for

clear error," recognizing that the "guidelines do not require the government to

make a fraud loss determination with precision; the figure need only be a

reasonable estimate given the information available to the government."  *Cabrera*,

172 F.3d at 1292.

Defendants argue that the district court made "statistical sampling" errors in

determining the tax loss.  (*See* Moss Br. 36-50; Jenkins Br. 13-17.)  Defendants

devote considerable portions of their briefs to discussing the IRS special agent's

statement that the "average intended loss" was $3,261.54 on the 27 tax returns for

which he recommended prosecution  (Sentencing Tr. 21-22.)  Defendants

incorrectly claim that the district court based its entire tax-loss calculation on this

number, and argue that these returns are not a representative sample of the total

universe of tax returns Flash Tax prepared and submitted during the periods in which defendants were members of the conspiracy.  Defendants also argue that this sample of 27 returns was too small as a percentage of the total number of tax returns filed.

Defendant's arguments have a number of failings.  Most important, they misapprehend the manner in which the district calculated the tax loss in this case, which did not rely on any sampling.  Defendant's arguments also misunderstand the statistical authorities on which they purport to rely.

1.    *The district court's tax-loss finding did not rely on statistical sampling*

The district court did not — contrary to defendants' arguments — base its tax loss calculation on an "extrapolation [from] 27 known, fraudulent tax returns." (Moss Br. 41; *see also* Jenkins Br. 13.)  The district court based its finding on the total amount of tax refunds obtained by Flash Tax during the conspiracy; it then used the "27 known, fraudulent tax returns" as a check to ensure that its initial calculation was accurate.  The court specifically noted that it used "several calculations" (Sentencing Tr. 60) to compute the tax loss, and defendants needlessly confuse the issue by focusing on an aspect of the district court's reasoning that was not necessary to its ultimate conclusion.  *See United States v. Chaplin's, Inc.*, 646 F.3d 846, 854 (11th Cir. 2011) (declining to "evaluate [a] district court's contested findings" of fact where the record was sufficient to uphold the district court's decision without them).

Most of the relevant numbers are not in dispute.  For the tax years 2004 through 2006, when both Moss and Jenkins were members of the conspiracy, Flash

Tax obtained tax refunds of at least $29,853,277.[33]  This number is composed of

known refund amounts from known, filed returns: $3,630,884 from the 858 returns

filed in 2005 (for the tax year 2004) (*see* Sentencing Tr. 23; Supp. RE Tab 3 at 25),

$16,639,874 from the 4,121 tax returns filed in 2006 (for the tax year 2005) (*see*

Sentencing Tr. 24; Supp. RE Tab 4 at 125), and $9,582,519 from the 2,456 tax

returns filed in 2007 (for the tax year 2006) (*see* Sentencing Tr. 24; Supp. RE Tab

5 at 56).  These figures — tax refunds of approximately $30 million from 7,435

filed returns for the tax years 2004, 2005, and 2006 — are undisputed, and they

have nothing whatever to do with sampling or extrapolation.[34]

There is only one additional number necessary to calculate the tax loss for

both defendants: the percentage of this $30 million in claimed refunds that was

fraudulent.  In order for the tax loss to be in the range between $7 million and

$20 million, as the district court found (*see* Sentencing Tr. 61-63 (citing USSG

§2T4.1(K)), approximately 25% to 65% of the total amount of Flash Tax's claimed

refunds must have been fraudulent.  And, as the district court concluded, the record

in this case "easily" (*id.* at 63) supports such a finding.  The court found that the

testimony at trial established that somewhere between 80% and 100% of Flash

---

[33] Sentencing Tr. 60; PSR Moss ¶ 40; PSR Jenkins ¶ 31; Doc. 263 at 5 (Gov't Sentencing Mem. for Moss); Doc. 262 at 5 (Gov't Sentencing Mem. for Jenkins); Supp. RE Tab 1 (Gov't Sentencing Exh. 1).

[34] The district court did use extrapolation to estimate the total amount of refunds claimed for the tax year 2003 — a number relevant only with respect to Moss, since Jenkins was not involved in the conspiracy for that tax year.  Although, for the reasons described below, this use of extrapolation was not improper, it was also not necessary to the district court's overall tax-loss finding.  Accordingly, we omit any refunds or tax loss from the 2003 tax year from our discussion in this section.

Tax's returns were fraudulent (*id.* at 60). Indeed, the evidence at trial suggested that any non-fraudulent return would have been accidental: Moss never trained his tax preparers to prepare anything other than fraudulent returns. (*See, e.g.*,Tr. 2.146 (Babies testimony) (if a client came in who "made too much money, they need to make less money," and if a client "made not enough money," then "[y]ou would give them more money.); Tr. 4.105 (Hargrove testimony) ("[W]e was supposed to say, we can get you 12 or $15,000, between 12 and 15,000 to boost your income if you had two dependents and get the maximum refund."); *see also* Sentencing Tr. 46 (testimony of IRS Special Agent Wilson) (acknowledging the possibility that "there might be a good return or a return where part of the refund was valid and part was invalid").) And given Flash Tax's return-preparation fees of at least $500 (*see* Tr. 4.184 (Crittenden testimony)), anyone who was actually entitled to the maximum EIC refund would have saved quite a bit of money by going to a legitimate tax preparer.

Nonetheless, rather than take 80% of $30 million to calculate a tax loss of $24 million — well into the range that would result in a base offense level of 28 instead of 26, *see* USSG §2T4.1(L) — the district court adopted the government's "conservative" approach and assumed that only "50 percent of the total amount [of refunds] claimed" was fraudulent (Sentencing Tr. 62), putting the tax loss into the range between $7 million and $20 million. (*See also id.* at 63 (noting that a panel of this Court approved of such an approach in *United States v. Jordan*, 374 Fed. App'x 3, 6 (11th Cir. 2010) (unpub.)).) The district court's finding is far from clearly erroneous. Indeed, Moss does not even contest this finding in his

- 24 -

sentencing argument (*see* Moss Br. 36-50), and Jenkins' assertion in her brief that "the evidence at trial supports a lower percentage, around 25 percent or one third," does not even cite to any evidence — it simply cites a question by Jenkins' counsel to the IRS special agent during the sentencing hearing.  (*See* Jenkins Br. 16 & n.84 (citing Sentencing Tr. 42).)  *But see United States v. McGarity*, 669 F.3d 1218, 1245 n.37 (11th Cir. 2012) ("questions by the attorneys are not evidence").  At the very least, Moss and Jenkins fall well short of firmly and definitively establishing that the district court's 50%-fraud finding was too high.  *See Rodriguez-Lopez*, 363 F.3d at 1137 (explaining that this court will not disturb a factual finding by the district court unless its review of the record leaves it "with a definite and firm conviction that a mistake has been committed").

  2. *Defendant's statistical arguments are misguided*

  Although defendants' statistical arguments are irrelevant for the reasons just discussed, they also misunderstand the statistical principles that govern sampling and extrapolation.

  The primary authority on which both defendants rely, *United States v. Mehta*, 594 F.3d 277 (4th Cir. 2010), applies a straightforward statistical principle in the context of sentencing: if a given sample is not "representative of the larger group" one wants to know something about, then it is erroneous to "us[e] that sample to extrapolate" some characteristic regarding the larger group.  *Id.* at 283. As the Fourth Circuit explained, to "extrapolate means to estimate the values of a function or series outside a range in which some of its values are known, *on the assumption that the trends followed inside the range continue outside it*."  *Id.*

(quoting Oxford English Dictionary (2d ed. 1989)) (emphasis added; internal quotations marks and alterations omitted).  Thus, for example, one cannot properly conduct a presidential poll at a political rally: the attendees at the rally are not randomly chosen, but instead are presumably at the rally because of some characteristic (political opinion or affiliation) that is related to the characteristic being measured (which candidate they plan to vote for in a presidential election). In statistics, this type of error is called "bias" or "nonsampling error" — it is not "random error" inherent in the process of sampling but instead is an error that occurs because the particular sample chosen is systematically different from the larger group of interest.  *See* David H. Kaye & David A. Freedman, *Reference Guide on Statistics* at 217, Reference Manual on Scientific Evidence (Fed. J. Center 3d ed. 2011) (hereinafter "*Reference Guide*"); *see also* C. Paul Wazzan & Kenneth D. Sulzer, *Statistical Analysis and Interpretation of Data Commonly Used in Employment Law Litigation*, 8 Duquesne Bus. L.J. 79, 82 (2006) (explaining that, if one wanted to know "the average strength of the UCLA student body," the "football team would not be a representative sample; we would say that the football team is a 'biased sample' in that it is clearly atypical").  By contrast, "sampling error" refers to the error inherent in any sampling, and this type of error can generally be reduced by increasing the size of the sample.  *See Reference Guide* at 246.  Thus, to take the presidential-poll example, a pollster who questions a random sample of voters can reduce the error inherent in her poll (and therefore shrink what is referred to as the poll's "confidence interval") by increasing the number of people she questions.

- 26 -

In short, there are two potential problems with any attempt to extrapolate from a sample: (1) the sample might not be representative, and (2) the sample might not be large enough. Defendants' briefs sow confusion by consistently conflating the two.

With respect to the first issue, the district court correctly recognized that it could not use a sample of 27 returns that were chosen because they "had indicators of fraud" (Sentencing Tr. 50) in order to estimate the percentage of all of Flash Tax's returns that were fraudulent. The answer would necessarily be close to 100% — that would be like sampling the UCLA football team to determine what percentage of UCLA students were athletes. Instead, as discussed above, the district court looked to the evidence adduced at trial in order to determine what percentage of Flash Tax's returns were fraudulent. (*Id.* at 60-63.) The only time the district court relied on extrapolation from this fraudulent-return sample was when estimating the total amount of refunds claimed by Flash Tax for the tax year 2003 — Flash Tax's records showed that 828 returns were filed that year, but the IRS did not know the amounts of the refunds claimed on those returns because it did not have the filed returns as it did for the later tax years.

In any event, as described above, the 2003 tax year is irrelevant to the district court's finding that the tax loss fell between $7 million and $20 million.[35]

---

[35] In fact, using the sample average of $3,261.54 (Sentencing Tr. 22) to estimate the total amount of refunds claimed for 2003 likely yielded an erroneously low estimate. The evidence at trial indicated that the average refund was closer to $4,000 (based on the EIC "sweet spot") — and, indeed, the average refund amount for the tax years 2004 through 2006 was $4,015.24 per return. *See id.* at 24, 60;

(continued...)

And it was certainly not error for the district court to double-check its initial
calculation (Sentencing Tr. 61) by multiplying the sample average of $3,261.54
times 8,263 (the total number of returns filed for the tax years 2003-2006) —
yielding approximately $27 million, which is entirely consistent with the district
court's finding that somewhere between 80% and 100% of Flash Tax's returns
were fraudulent (*id.* at 60).[36]  In short, the district court quite properly checked its
work using "several calculations" (Sentencing Tr. 60) before ultimately erring on
the side caution and finding a tax loss below $20 million.  This was not error.

Finally, although defendants' "sampling" arguments are a red-herring for the
reasons discussed, it is nonetheless worth pointing out that defendants seriously
misunderstand statistics when they argue that the "use of less than 1% of the total
number of tax returns is unreliable and unreasonable."  (Moss Br. 42; *see also*
Jenkins Br. 13-14.)  This is wrong: "it is the absolute size of a sample rather than
its ratio to the population from which it is drawn that determines the sample's
reliability."  *United States v. Gomez*, 730 F.2d 475, 482 (7th Cir. 1984) (en banc)
(Posner, J.) (citing Freedman, Pisani & Purves, Statistics 332-33 (1980)).  This is
why pollsters can sample the same number of people to predict the result of a

---

[35] (...continued)
*see also* Supp. RE Tabs 3, 4, 5 (listing 7,435 filed returns as claiming total refunds
of $29,853,277).  In short, if the district court had used the 2004 through 2006 tax
years to estimate the average refund amount claimed in 2003, it would have
calculated an even larger number.

[36]  Because the total amount of refunds claimed for the tax years 2004 through
2006 was approximately $30 million, the 80-100% fraud estimate should yield a
tax-loss range of approximately $24 million to $30 million — entirely consistent
with the district court's $27 million figure.

statewide election in either Wyoming or California.  Indeed, Moss's brief to this Court cites seven different authorities on statistics, and three of them make this point explicitly: "Perhaps counterintuitively, the size of the population being sampled does not determine the size of the sample that needs to be taken.  It is the absolute, rather than the relative, size of the sample that matters."  Laurens Walker & John Monahan, *Sampling Evidence at the Crossroads*, 80 S. Cal. L. Rev. 969, 981 & n.79 (2007); Fred S. McChesney, *Statistics: The Language of Science (Part I)*, 9 Kan. J.L. & Pub. Pol'y 49, 52 (Fall 1999) ("Finally, it is not the case that larger populations require larger samples for valid statistical inferences. . . .  The inferences that are valid from the sample have nothing to do with the sample size relative to the size of the underlying population."); Herbert L. Roitblat, *Using Sampling in E-Discovery* at 2 (American Law Institute – American Bar Association Continuing Legal Education May 18-20, 2006) ("It may be somewhat surprising to learn that the accuracy of a survey estimate does not depend on the size of the population (provided that the population is large).  Rather, it depends on the size of the sample and the randomness of selection of the sample.").

In sum, defendants misunderstand the relevant principles of statistics, and they offer no reason to think that a sample size of 27 returns is "unreliable and unreasonable."  (Br. 42.)  More important, defendants misconstrue what the district court actually did in this case: use the average tax loss from the sample of 27 returns as one of "several calculations" (Sentencing Tr. 60), in order to double-check that taking 50% of the sum of all the Flash Tax refunds for which the IRS had records would yield a reasonable estimate of the tax loss.  Because the district

court's conservative estimate of the tax loss was based on the evidence at trial and was reasonable, defendants' sentences should be affirmed.

## CONCLUSION

For the reasons above, the district court's judgment should be affirmed.

Respectfully submitted,

KATHRYN KENEALLY
  *Assistant Attorney General*

s/ Alexander P. Robbins
FRANK P. CIHLAR               (202) 514-5396
  *Chief, Criminal Appeals &*
  *Tax Enforcement Policy Section*
GREGORY VICTOR DAVIS   (202) 514-5396
ALEXANDER P. ROBBINS    (202) 514-5396
  *Attorneys*
  *Tax Division*
  *Department of Justice*
  *Post Office Box 502*
  *Washington, D.C. 20044*

*Of Counsel*:
SANDRA J. STEWART
 *Acting United States Attorney*

DATED:     April 29, 2013

- 30 -

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B) because it contains 8,074 words, excluding the parts of the brief

exempted by Fed. R. App. P. 32(a)(7)(B)(iii), and has been prepared in a 14-point,

proportionally spaced typeface (Times New Roman) using WordPerfect X3.


s/ Alexander P. Robbins<br>
ALEXANDER P. ROBBINS<br>
<i>Attorney for the United States</i>

DATED: April 29, 2013

## CERTIFICATE OF SERVICE

As provided under Fed. R. App. P. 31(b), I served a copy of this brief, using this Court's electronic transmission equipment and via U.S. mail, on the other parties to this appeal, on this date, at the following addresses:

> Patricia Kemp, Esq.
> 817 South Court St.
> Montgomery, Alabama 36104
> 334-834-2099
> Patricia_Kemp@fd.org
>
> Richard B. White
> Law Offices of Vickers & White, PLLC
> 428 South Lawrence Street
> Montgomery, Alabama 36104
> 334-269-1192
> rwhite@vickersandwhitelaw.com

s/ Alexander P. Robbins
ALEXANDER P. ROBBINS
*Attorney for the United States*

DATED:    April 29, 2013

# ADDENDUM

Government's Exhibit 173
(Introduced into Evidence at Tr. 5.93-94.)



Earned Income Tax Credit 2004 Single and Head of Household



GOVERNMENT EXHIBIT

173



Earned Income Tax Credit 2004 Married Filing Jointly

## Earned Income Tax Credit 2005 Head of Household and Single





Earned Income Tax Credit 2005 Married Filing Jointly



Earned Income Tax Credit 2006 Single and Head of Household



Earned Income Tax Credit 2006 Married Filing Jointly